Yeah, my clients didn't like the way I did it. It was like I didn't have to hire them. This is another one we're going to have to look into. Okay, next case is No. 17, 1389, Hologic, Inc. v. Smith & Nephew, Inc. Mr. Weaver. Thank you, Mayor. Please, the Court. This is not a case about substantial evidence. This is rather about the proper application of the law of written description. The question is, has possession been shown of the limitation in question within the four corners of the patent? Whether the specification reasonably conveys that the inventor had possession of the invention within the four corners of the document, right? That's exactly right, Your Honor. And so let's look within the four corners of this specification. There is no allegation anywhere, no suggestion, no hint that the text of the specification tells us how or where the light guided issue is placed. And this isn't the game of gotcha, Your Honor. Can I ask you a question? Yes, Your Honor. What is the difference between a light guide and a fiber optic? A light guide is a genus of the fiber optic species. What other light guides are there besides fiber optics? There are solid glass light guides. There are LED light guides or any number of other kinds of ways that physicians look inside the human body. Do all of these endoscopes have to have a light source so that you can see inside the body? In one way or another, yes, Your Honor, some are separate devices. Sometimes you have a physician's assistant holding it. Sometimes it's fixed within the device. Sometimes it's removable within the device because you want different kinds. You want very bright. You want broad. I mean, think of a flashlight where some are very broad but not as strong and others. So you have removable. There's all different species of light guides. But yes, I mean, I don't think you'd want a doctor performing a procedure in the body without some external form of light. But here, let's see. Yes, Your Honor. Here the question is, and remember, the language we're talking about, as I was about to say, this isn't the game of gotcha, Your Honor, where, you know, like Posen where we all know that prescription information is on a piece of paper. This limitation was added specifically to overcome prior art. This limitation was added to overcome prior art that had removable light guides. And so not only do they say our light guide is permanent and that's different from the prior art, they also say it's in the first channel and that's different than the prior art. Isn't the first channel, though, the light channel? It's called the viewing channel in the patent. And as the examiner noted, every description of the viewing channel and every description and every picture of the viewing channel only shows a lens. It doesn't show light coming in, not light going out. What about the one picture that has the line that suggests the light source? Your Honor, the only lines I'm aware of are in Figure 3. And if you look at Figure 3, the light is coming in. That's a camera, so that's a lens. And 13 is described as the lens. So that's saying the light is coming in from the outside. It's another way of saying that's taking pictures. So that's not describing light going out. That's describing light coming in. And that's well described in the patent. Where would it be the connection for the light source in that Figure 3 is it identified as being element 8? Correct, Your Honor. Okay. So it's your position that the light could be somewhere other than the viewing channel 6? In fact, it's pretty clear that it's not viewing channel 6. If we look at Figure 1A, we see, if you look at Figure 1A of the patent, we see an empty, unmarked circle that is the viewing channel. So that top of the, you kind of look at it as a Figure 8. That is empty, Your Honor. What's in the other channel? That is the lens. No. Oh, the working channel. I'm sorry. The working channel. That's where you put the snipper, whatever you're going to put in there. So in this case, you're talking about the device for removing tissue. But with endoscopes, generally, you put anything in there. You can put a loop resection device. You can put RF energy device. You can put scissors, effectively. That's called the working channel. Would it make sense to put a light source in the working channel? Sure. There's no reason. Why? But then it couldn't work, right? Well, in fact, Your Honor, there are, and for example, our expert, Mr. Walbring, talked about this at A2659. Let's suppose you want to do two different things, one requiring a wide source of light, another very powerful, narrow source of light. You could actually put the light source and connect it to the working device. So rather than having the endoscope being the source of light, you could have, in the one case, the loop resector have the light source. And then, so you want to scrape it first, and then you want to go in more finely and put scissors or whatever. I'm just picking things out of the prior art. You can have the light source attached to the working device, and that's, in fact, what the prior art does. That was the prior art they overcame. Grossi, for example, had a removable light guide precisely because you might want to change what kind of light you use. Do you agree with the definition of the person of ordinary skill in the art as found by the board here? Yes, essentially, Your Honor. But you're not appealing. No, no. Yes. And that's somebody with five years of experience. That's right. Do you agree that that's highly relevant to the written description inquiry? Oh, yes, Your Honor. And I think that person would be aware that there are multiple light guides. But remember, one thing that the board, and I really want to focus on Figure 1A, because this isn't just a case where we're arguing there's an absence of evidence. Here we're saying there's evidence of absence of the limitation. You argue in the blue brief that it was error for the PTAB not to consider the drawings of Figure 1A. Absolutely, Your Honor. If the PTAB was able to find adequate written description without looking at the drawings at all, would this still be error? Yes, Your Honor, and that would be the PharmaSTEM case, Your Honor's PharmaSTEM case, the Boston Scientific case. Let's suppose that this is a coffee cup, and I said that my claim was a cup with coffee in it. And they had experts that came in and said, I know from looking at the outside that there must be coffee inside. Now, we would say that's not sufficient. But clearly, if I now have a figure, the exact same embodiment, and I now can look in the cup and see that it's water, not coffee, clearly not only is that relevant, but under the court's L.A. Biomed case, the Allergan case, the Rivera case, when you have evidence that contradicts what the experts say, then you've got to take that into account, that that overwhelms the effect of obviousness finding. So here we have figure 1A and figure 3, for that matter, that actually show us what's inside the endoscope, and there's no light guide at all. What about the two expert declarations that are provided that talk about one, I think, is a former patent examiner in this field, and the other one is a doctor, and both of them rely on things other than figure 1 in order to come to the conclusion that the specification does convey the claim limitation to one of ordinary scaly art. Your Honor, that is an analytical error on the part of the PTAB to accept that, because what they say is that the entire argument is we look at figure 2, and the outside of figure 2 looks like the kind of endoscopes we know have permanently affixed light guides. Now, there are multiple problems with that analysis, analytical problems, not evidence problems. Number one, as the district court found in the related litigation and as is plain from the patent, there's no claim that this is an improvement on the prior art or relies upon the prior art. In fact, it expressly says this is a new endoscope. So that's a problem. The second problem and the more fundamental problem is that we see inside the scope. So if it was just figure 2, if that's the only figure in the patent, we'd have a harder hill to climb. We think we'd still climb it, but it would be harder. But once you throw figure 1A and figure 3 in the mix and we no longer have to guess what's inside the cup, but they've now shown us what's inside the cup, we now know it's water, not coffee. And here we now know there is no light guide in the working channel. One of the problems I'm having with your argument is that you started by standing up here and saying this is not a substantial evidence case. Right. But I think all we've discussed so far is facts, and I don't understand why this is not a substantial evidence case. Your Honor, I think this is analogous to your Honor's Smith and Nephew v. Wray case, that there are facts, but if the facts are proving the wrong thing, what their evidence proves, if you accept it, is that it would have been obvious to add a light guide in some channel somewhere. That's what their evidence says. I look at the outside of this, and based on my knowledge of the art, I believe I can see it in there. I would expect it to be in there. But that's not what the law is. I don't think that's what obviousness is either. Well, Your Honor, maybe the closer analogy is the TurboCare case, then. And let me make sure I get the language right. This Court found that even though the, quote, only viable location for a mounting spring was where the claim said it, you were still obligated to show within the four corners of the specification that there was a mounting spring where they said the mounting string should be in the claims. Here there is literally nothing. At the Board's argument, they acknowledged, admitted, there is no depiction of the light guide. So what is it within the four corners? What language within the four corners? What picture within the four corners says that this inventor had possession? He told the world he had invented a novel endoscope, and now he's saying, but I'm just kidding, when it comes to other things, I'm going to rely on what you know about prior art endoscopes. And now when we look, again, all of this... What about where it says a connection for the light source is also present for connection to a fiber optics bundle, which provides for lighting at the end of lens 13? Does that in any way suggest the location of where it would have to be, since it has to provide light at the end of lens 13, which is in channel 6? First of all, I think that sentence profoundly supports our position. Because if there was a light guide there, as opposed to merely a connection for a light guide, if I buy a new DVD player and it says HDMI connector, that means that there's a plug there, not that the cable, the actual HDMI cable's in the box. This says a connection for a light source is present. I hear what you're saying. I thought about that too. But then when I looked at the... There's a couple of prior art references that we relied upon that have a permanent light guide. And in those, there's also something identified as the connection. So I don't think the use of the word connection necessarily tells me whether it's permanent or not. I agree. I think it supports us. But the point is it doesn't clearly evidence possession. So the burden is on them to show within the four corners a clearly evidenced possession. I'm not saying it's a slam dunk. I'm saying it's ambiguous at best and supports us, I believe, to some degree. But that's not our burden. It's their burden to show within the four corners absolute possession. You direct us to some statements made by a district court judge in Massachusetts in a related case. I understand that's currently stayed? Correct. Okay. What weight should we give those statements? It seems like they're inapplicable to our review. The only place, the only relevance we state is when they're trying to avail themselves of the fact that it looks like the prior art. And the district court said, and for that matter the examiner agreed, the district court said that you read the specification and they're not suggesting to you that this is an improvement on prior art, but rather that it's a new endoscope. And particularly in light of the Biomed and Allergan cases. But how does that get to us? It's not binding in any way, Your Honor. I just think it's further persuasive evidence that other people agree with us that this isn't saying this is an improvement on the prior art, that this is saying here's a new endoscope and therefore you shouldn't be relying on what the experts say about it. I'm not saying it's, I didn't think you were saying it was binding, but I don't see a place for it exactly. Well, if you, as I. Excuse me, within the rule of law panoply. Yeah, if you agree with us that the fact, that it's particularly inappropriate to say we're going to gap fill with prior art when the specification is saying this isn't any old prior art device, this is a new scope, then the fact that someone else agreed with us is just, it's just a pat on the back, a, you know, we're not crazy on this. I'm obviously into my rebuttal time. Let's hear from the other side, and we'll save you rebuttal time. Mr. Albrecht. Thank you, Your Honor. May it please the Court. This appeal turns on a question of fact, whether substantial evidence supports the Board's conclusion that a person of ordinary skill applying their practical knowledge would have understood with reasonable clarity from the priority document, the PCT, that the inventor had possession of the claimed invention. In other words, of using a known endoscope with a fixed light guide to practice the claimed medical treatment method. Counsel suggested the invention was an endoscope. We respectfully disagree. The invention makes clear it's a medical treatment method, and it used known endoscopes. And what does the record show? And, by the way, all the Board did here, to be clear, was to find that the patent owner was entitled to his own PCT's priority date. Now, how did they get there? The record showed that there were two types of... I would like to ask you a question. Yes, Your Honor. One of the things that I was very confused about was there's testimony and a finding by the PTAB saying that the light guide in your patent is like Bonnet and Thibodeau and not like Grossi and Savage. Yes, Your Honor. And looking at these figures. And I would like you to walk me through why the figures are more like Bonnet and Thibodeau as opposed to Grossi and Savage. Certainly, Your Honor. I'd be glad to. And perhaps the best place to look for that would be Appendix 15, 34, and 35, which are Dr. Isaacson's declaration. And what he explained is that there were two types of endoscopes known in the prior art. There was the kind exemplified by Bonnet and Thibodeau, which is a kind with a permanently affixed light guide. And there was another kind, the kind exemplified by Grossi and Savage, which was the kind with a removable or telescoping light guide inserted from the outside. And what Dr. Isaacson testified in his declaration, and he's on the faculty of Harvard Medical School, 25 years' experience practicing using both the inventive method and the prior art method. And his declaration explains, a person of skill in the art looking at figures two and three of the priority document, the PCT, would understand that what was shown here was the Bonnet or Thibodeau type of endoscope. In other words, it was the kind with a permanently affixed light guide. And he goes on. Let me explain exactly, Your Honor, why. So what he explains is if we look at Figure 3 on 1535, and by the way, there are additional labels added to this in Mr. Apley's declaration, that's Appendix 15, 39 to 42. But looking at Figure 3, what we see are a couple of things that Dr. Isaacson emphasizes. Element 8, which is the light guide connection, and Element 7, which is the viewing tube, you can see in Figure 2, and even more clearly in Figure 3, which is the cutout, the cross-section, they are permanently attached to the endoscope. Now, why does that matter? That matters because it was undisputed that the optical components of an endoscope, which include the observation and the illumination parts, have to be aligned. So they're always made in such a way that they're fixed together. But that can be done in one of two ways. They can be affixed to the endoscope itself, the bonnet or cubotto type shown here, or they can be affixed to this thing called the telescope, which is inserted from the outside. What Dr. Isaacson explained here is because you can see Elements 7 and 8 in Figure 3 are actually attached to the endoscope, that teaches a person of skill, oh, this is the bonnet kind, the cubotto kind. This is the kind in which the light guide is permanently affixed. And that alone, Your Honor, is substantial evidence. And again, the standard of review here, of course, the board's standard of review of the CRU examiner was de novo. They made the findings here. This court's review is substantial evidence. Can I just back me up for a second? So I think you're saying that, for example, in bonnet and cubotto, which are at page appendix 1534, the things that are permanently affixed for bonnet, for example, are the elements designated 7 and 5? Correct, Your Honor. They match up with Elements 8 and 7, respectively. Right. And in cubotto, if I understand it correctly, it's Elements 16 and 24. Yes, I believe that's right, Your Honor. Okay. So what Dr. Isaacson is explaining is what would a person of skill in the art coming to this PCT figure understand from it? And he testified at great length and in detail showing these figures that looking at Figure 2 and Figure 3 of the PCT, that's what the person sees. Now, he was backed up by two additional expert declarations, Mr. Apley and also Mr. Chinook, who's an endoscope designer. So we have a doctor, we have an endoscope designer. Really, Hologic's expert didn't actually tackle that question head-on, although even if they had, it would have been a conflict of evidence to be resolved by the board. But they actually didn't really rebut that. What they did was they basically sidestepped it and argued that, well, it would be theoretically possible to take Figure 2 and somehow design a different type of endoscope in which the light guide wasn't fixed. But that theoretical construct about what could happen are not the test. The test under VASCAF... Yes, Your Honor. I was just going to ask for the appendix site on that. Do you happen to know the appendix site for what you're referring to? Yes, Your Honor. So there are two. One is Dr. Domenicis. At appendix 2289 in paragraph 8, that's Hologic's first expert, he generically states, sort of as an ipsy-dixit, that he doesn't believe there's a basis for a person of skill in the art to understand what Dr. Isaacson says they would understand. I'm sorry, what paragraph is that? Paragraph 8. Okay. But then on the next page, 2290 of the appendix, in paragraph 11, we actually get his explanation, and this is all it is. He says, even if one of skill in the art suspected that the lens or light guide was permanently affixed or not from the drawings, it would not necessarily have to be so. And it's this necessarily test that's erroneous. And that's what the board found, and they were right. Under VASCAF and under Posen, that's simply not the test that this court has taught. In fact, this case is really very much on all fours with VASCAF, where precisely the kind of error that Polagic is asking, asked the board to make and is now asking this court to make, was corrected by this court in VASCAF when the district court had made it in that case. The district court in VASCAF had suggested that there was this necessarily test, and this court said no. What you look to is what a person of skill in the art would understand, not some theoretical construct about how the device could be designed differently. So to answer Your Honor's question, I've pointed to where it is in Dr. Domenes' testimony. They do have one other expert, and that is Mr. Walbrink. Appendix 2649, in paragraph 11 of his declaration, we have the exact same problem. He says, in purportedly disputing our expert, all he really says is, I do not agree that this is necessarily... Paragraph number, I'm sorry? Paragraph 11, Your Honor, on 2649. Yeah, I've got... He says, I do not agree that this is necessarily so. And then he goes on to suggest that it would have been obvious, but not necessarily the case. But this is not an obviousness situation. What Dr. Isaacson testified to very clearly, and there's certainly at least substantial evidence of this, is that a person of skill in the art would know that this is the Bonnet or Kubota type of light guide, particularly here, where, as the board found, this is not an unpredictable art. They found expressly that the optical guide at issue here is a predictable art. This is not something that would have required the kind of speculation that some of the cases cited by counsel would have called for. So we have... And by the way, I should also note that the board's decision was actually fully consistent with many things that had come before. The original examiner, in fact, had originally found that the PCT, in particular Figure 2, supported... There was written description support for the fixed light guide. The judge and jury in the Massachusetts case came to a similar conclusion. Now, at the CRU, when Hologic... So Hologic filed two inter-parties re-exam requests. The first one was rejected. The second one, which they filed on the eve of trial in July of 2012, the CRU granted that request. But then, after considering the expert declarations, including Dr Isaacson and Mr Apley, the CRU examiner withdrew all the rejections and specifically found that the PCT supported claims to methods involving a permanently affixed light guide because artisans would have understood that that was the case from Figure 2 of the PCT. Now, the CRU examiner later changed her mind, but that was in response to Hologic's legally erroneous contention that the PCT had to disclose a light guide that was necessarily permanently affixed. Again, it was this incorrect legal test. And so when the case went to the board, they conducted their de novo review, and they found from Dr Isaacson's, as well as the other declarations, that there was substantial support. And again, Appendix 1534 and 35 is perhaps the clearest place to see that. So that's the issue here, and it's one that this court has referred to repeatedly as a fact question. In fact, in Union Oil, this court called it an intensely factual question. The board here really did exactly what this court taught in Pozen and in Vascath, which is to take the priority document and to look at it in light of the corresponding expert testimony about how it would be understood by a person of skill in the art. In fact, in Vascath, there was no writing at all. The priority document was a design patent, and the district court had erroneously required the patentee to show that all possible alternatives to the claim structure were necessarily excluded, very much like what Hologic's experts are trying to do here. And this court reversed and said, no, that's not the test. Likewise in Pozen, there was no express written disclosure in Pozen of the therapeutic package, but this court affirmed a holding that the practicality of the situation made it clear that a person of skill in the art would understand such packaging to be present. I had asked Mr. Wolf about what is a light guide? Yes, Your Honor. And what is your answer to that? My answer is pretty much the same as Mr. Wolf's, Your Honor. A light guide is a genus, and a fiber optic bundle is the species. And they did make an argument at one point in their brief suggesting that somehow that the fiber optics bundle species wouldn't be sufficient to support a claim to a genus of light guide. Again, this is a classic fact issue, which the board addressed, had more than substantial evidence to do so from Dr. Isaacson and Mr. Chinnick's declarations in particular. And in fact, this court held in Bilstad that it's a general rule that the disclosure of a species provides sufficient written description support for a later filed claim to a genus. And the point was affirmed by this court more recently in Heineck's Semiconductor versus Rambus, which is on point here. In Heineck's, the court held that Heineck's failed to argue that the disclosure of the species, which in that case was a multiplex bus, was not representative of the genus. And here, likewise, Polagic fails to offer any evidence to suggest that a fiber optic bundle isn't representative of the light guide genus, so they failed to rebut the board's factual finding that the species supports the genus. That's particularly true here where it's a predictable field. At Appendix 25, the board found that the field of optical guides is not an unpredictable field. Now, Ariad teaches that... What's the evidence that it is predictable? So, Your Honor, the evidence was in a number of things. In the declaration of Dr. Isaacson in particular, he explained that the optical components and the illumination components must be fixed together, that it's always done that way, and particularly the fact that the invention here  This isn't a light invention or a flashlight type of invention or a laser invention. It's an invention about a medical procedure, using a known endoscope with a known light guide for a novel treatment method. So the particular type of light guide used is not material to the invention. I would point Your Honor to Appendix 2556 for that. That's Mr. Chinnick's declaration in paragraph 17. I want you to address a question which doesn't hurt you, and that is that the PTAB said that it was irrelevant, your expert's testimony was irrelevant, whether Pasita had experience... This is specifically directed to the uterus, and they said experience with endoscopes specifically related to that wasn't relevant. How can it not be wrong? So what I believe the logic was arguing... I think Your Honor is referring to the argument that they made in which they point to the fact that one of our experts said a person of skill would not have experience with hysteroscopes. They used the word hysteroscope, but what that means is an endoscope that's used for these intrauterine procedures. What our expert had said is people were very familiar with endoscopes. What they were not familiar with, of course, since this was a novel invention, was the use of an endoscope of that type for procedures in the uterus, and that's the distinguishing factor. The distinguishing factor was not what type of light guide was used or anything like that, or the endoscope design. Those were known in the art. What was novel here was the use of this type of endoscope with various components for a particular novel intrauterine procedure. So that's the distinction here, and the board really, I think, correctly called the logic on that suggestion because they were really confounding the notion of a hysteroscope with that of an endoscope. The patent and the PCT make clear that the endoscope itself was not novel. And by the way, there was a suggestion made in the briefing, in the reply brief, that that was somehow a new argument not raised before the board. I would just note for the record that's not correct. Appendix 3057 and 3082 are places where that was discussed by the board. So the substantial evidence test here is met. The board made careful factual findings based on a detailed record and the declarations of highly qualified experts. They followed Vascaf and Pozen and Streck in doing so. Those are the key cases here. And in the 25-page unanimous opinion of the board, they really walked through the dispositive issues and the evidence very clearly and with care. And for that reason, the decision should be affirmed. Any more questions? Thank you, Your Honor. Mr. Rule. May it please the Court. The board committed clear legal error here. I'm quoting now from the Los Angeles biomedical research case at 1058. LAB cannot rely on stand-alone references that it failed to incorporate in the provisional application in order to make out its priority claim. That is exactly what happened here. The board and Smith and Nephew relied on stand-alone references, Bonnet and Caboto, not cited anywhere in the specification of the prosecution history to find the disclosure, the purported disclosure, within the four corners. It gets worse. At column 2 of the patent line 17 to 23, in discussing the prior art, the prior art that they purportedly rely on generically, such a device is consequently not very suitable for use in the treatment of such a cavity. The object of the present invention is to provide a device which can perform such a treatment. So they criticize the prior art, say they're providing a device, notwithstanding counsel's claim that it's about a method, they're providing a device, and now they're saying, but we're going to borrow from the prior art features of a device despite the fact that, A, they're not disclosed, and, B, they're criticized. But the coup de grace here, the thing that the Board never, never discussed is 1A and 3, that don't show the light guide. If nothing else, Your Honors, at least send this back to the Board to say, wrestle with that fact. We have, the case law that I cited, we have Pharma-STEM and BSC that says, you can't do that, you can't ignore contrary evidence. And here we have actual depictions of the part of the catheter where you would have to find a light guide if there's a light guide, if it was possessed by the inventor. And they acknowledge it's not there. So when you're saying, is there substantial evidence, Your Honor says, isn't this a substantial evidence case? Well, if you skip past the legal error that we assign to the Board, which I think is plain, but if you say, we're going to forgive them for that, we're going to give them a pass on that, at least make them wrestle with the only depiction of where we would expect the light guide to be, and there isn't a light guide. They can't just ignore it. You can't say, I respectfully submit, that something does not pass substantial evidence muster if the signal most important piece of evidence is not even discussed, let alone distinguished. Thank you for your time. Unless you have further questions. Thank you both. The case is taken in resolution.